UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
STELLA AMANZE,

              Plaintiff,

      - against -

TOMI ADEYEMI, LOLA SHONEYIN d/b/a
OUIDA BOOKS, MACMILLAN PUBLISHING
GROUP LLC d/b/a HENRY HOLT AND
COMPANY, and JOHN DOES 1-10,

              Defendants.
------------------------------------X

**MEMORANDUM AND ORDER**

18 Civ. 8808 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff Stella Amanze brings this copyright infringement action against author Tomi Adeyemi, her publisher Macmillan Publishing Group LLC ("Macmillan"), bookseller/publisher Lola Shoneyin, and John Does 1 through 10 for Adeyemi's alleged use of material from Amanze's work <u>Banished: A Novel</u> (hereinafter "<u>Banished</u>") in Adeyemi's work <u>Children of Blood and Bone</u> (hereinafter "<u>Children</u>"). Adeyemi and Macmillan now move to dismiss the operative pleading pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that the two works are wholly dissimilar. Because we agree that, as a matter of law, <u>Banished</u> and <u>Children</u> are not substantially similar, defendants' motion is granted in its entirety.

# I.  BACKGROUND

## A. Parties

Plaintiff is the author of the fictional literary work _Banished_, which she registered with the United States Copyright Office on May 1, 2000 and published under various ISBN numbers in 2001. Am. Compl. ("AC") ¶ 16, ECF No. 21. Defendant Tomi Adeyemi is the author of _Children_, a young-adult fantasy novel published in the United States in or around March 2018. Id. ¶ 10. Adeyemi has worked with defendant MacMillan (an American publishing company) to publish, market, and distribute her book, and has contacted defendant Shoneyin, the proprietor of a Nigerian publishing and distribution company, about republishing her book in Adeyemi's native Nigeria.[1]  Id. ¶¶ 14, 25.

## B. Summary of the Works

Because resolution of the pending motion turns on whether the two works are substantially similar, a "detailed examination of the works themselves" is required.  Walker v. Time Life Films, Inc., 784 F.2d 44, 49 (2d Cir. 1986).  The Court summarizes their contents below.[2]

---

[1]    Plaintiff also alleges that unnamed parties "may be involved in direct or contributory copyright infringement of [_Banished_]." Id. ¶ 15.

[2]    The following summaries are based on the Court's review of Tomi Adeyemi, CHILDREN OF BLOOD AND BONE (1st ed. 2018) and Stella Amanze, BANISHED: A NOVEL (rev. Jan. 30, 2003), submitted as exhibits to the Declaration of Robert B. Balin in Support of Motion by Defendants Tomi Adeyemi and Macmillan Publishing Group LLC to Dismiss Plaintiff's Amended Complaint, ECF No. 27.  See Global Network

i. <u>Children of Blood and Bone</u>

<u>Children</u> is a West African-inspired young adult fantasy novel telling the story of Zélie, her brother Tzain, and their companion Princess Amari as they embark on a month-long quest to bring magic back to the mythical land of Orïsha.  The tale is told from the shifting perspectives of three main characters (Zélie, Princess Amari, and her brother Prince Inan), who take turns narrating 85 eponymous chapters over the course of 525 pages.

The story begins on the Orïshan island of Ilorin, where Zelie, a headstrong girl of 17, lives with her father Baba and older brother Tzain.  Zélie is a "divîner," a child who, in an earlier time, would have developed into a "maji" (a person capable of wielding magical powers).  In this not-so-distant past, maji lived in relative harmony with "kosidans" (non-magical people), and Orïsha thrummed with magic.  Maji organized themselves into clans according to the deity that they worshipped and the corresponding magical powers that they possessed.  Members of the Ikú Clan, for example, worshiped the goddess Oya, who bestowed her followers

---

Commc'ns, Inc. v. City of New York, 458 F.3d 150, 156 (2d Cir. 2006) (permitting courts to consider documents outside the pleadings on a Rule 12(b)(6) motion where documents are integral to the pleading); <u>DiTocco v. Riordan</u>, 815 F. Supp. 2d 655, 658 (S.D.N.Y. 2011) (considering literary works outside the pleading in an analogous context), <u>aff'd</u>, 496 F. App'x 126 (2d Cir. 2012).  To the extent that we find that the works deviate from allegations or descriptions contained in plaintiff's Amended Complaint, the Court relies solely on the works themselves, which "supersede and control contrary descriptions of them, including any contrary allegations, conclusions or descriptions of the works contained in the pleadings." <u>Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.</u>, 602 F.3d 57, 64 (2d Cir. 2010) (internal quotation marks and citation omitted).

with "power over death."  <u>Children</u> at 160.  They became known as "Reapers" for their ability to command armies of the dead. Similarly, worshipers of the god Orí became "Connectors" of the Èmí Clan, possessing the ability to read minds and manipulate dreams.  Other maji had power over water (Tiders), fire (Burners), wind (Winders), iron and earth (Grounders and Welders), darkness and light (Lighters), health and disease (Healers and Cancers), time (Seers), and animals (Tamers).

The relationship between maji and kosidans eventually soured, culminating in an event known as "the Raid," during which King Saran (the kosidan monarch of Orïsha) severed the connection between the maji and the gods and massacred all living maji (including Zélie's mother).  Young divîners were spared, but came to constitute an oppressed underclass in post-Raid Orïsha, segregated from the rest of society and often referred to derisively as "maggots."  The reader learns that there is also a racial element to their persecution, as divîners have noticeably darker skin than their kosidan brethren.

Eleven years after the Raid, Zélie and her family struggle to make ends meet.  Concerned about their ability to pay an upcoming "divîner tax," Zélie and Tzain travel to the Orïshan capital of Lagos to sell an exotic fish that their father has caught.  As Zélie is leaving the market in Lagos following a successful sale, she is pulled aside by a girl begging for help.  Seeing the fear

in her eyes and hearing the King's guard in pursuit, Zélie agrees to lead her out of Lagos, only to realize upon escaping that the girl she has just helped abscond is King Saran's own daughter, Princess Amari.

Amari reveals that she fled the palace after witnessing her father murder her beloved handmaiden Binta (a divîner herself), and that she is carrying a sacred relic stolen from the maji during the Raid – a scroll that rekindles the connection between the maji and the gods and awakens their latent magical abilities. Zélie grabs the scroll and, much to her surprise, feels magic coursing through her veins. They return to Ilorin, scroll in tow, and seek guidance from a village elder named Mama Agba. Agba, a Seer who survived the Raid, touches the scroll and has a vision of the three teenagers embarking on a quest to revive magic in Orïsha. She directs them to an ancient temple in the ruinous city of Chândomblé, where she suspects they may discover what must be done to make her vision a reality.

Meanwhile, Prince Inan, a zealous but unproven defender of King Saran's regime, is tasked with locating Amari and recovering the scroll. Unbeknownst to King Saran, Inan is grappling with the emergence of his own magical abilities, awoken after he accidentally touched the scroll in Lagos. His powers are of the mind, and include the creation of a mysterious connection between he and Zélie through which they can both exist together in Inan's

dreamscapes. Fearful and ashamed, he uses his magical powers to track Zélie but hides them from the other soldiers in King Saran's army.

Zélie, Tzain, and Amari escape to Chândomblé just as Prince Inan and his men arrive in Ilorin. The fugitives are welcomed by a spiritual guardian named Lekan, who awakens Zélie's abilities as a Reaper and explains that, in order to bring magic back, she must perform a sacred ritual at the Holy Temple in thirty days' time. The ritual requires three sacred relics – two of which they have (the scroll and a dagger given to them by Lekan) and one that they must acquire (the sunstone, last seen in a desert town called Ibeji).

Inan catches up to Zélie, Amari, and Tzain at Chândomblé but they are able to escape once again, this time to Ibeji. Upon arriving, they discover that the missing sunstone is the prize in a gladiator-style competition. They enter and win, securing the sunstone. Meanwhile, Inan is able to "connect" with Zélie in one of his dreams, and she inadvertently discloses the trio's location. After killing a friend who had discovered his magical abilities and threatened to tell King Saran, Inan sets off to pursue Zélie, Amari, and Tzain with a renewed fervor. He eventually catches up to them and immediately engages Zélie in combat. As the two fight, mysterious masked figures kidnap Amari and Tzain, causing Zélie and Inan to make peace and set out together in search of their

siblings.  The two subsequently bond over shared grief, and Zélie
helps Inan come to grips with his fear of both magic and his own
father.  The two former adversaries become romantically involved.
Inan ultimately pledges to let Zélie continue on her journey to
restore magic to the kingdom after they find their siblings.

Zélie and Inan are able to track Amari and Tzain to a hidden
village of divîners in the Gombe River Valley.  Upon learning that
Zélie and Inan are themselves divîners, the villagers release Amari
and Tzain and promise to accompany the group on their journey to
the Holy Temple.  Before departing, however, they organize an ill-
fated festival to celebrate the imminent return of magic.  In the
midst of the festivities, horns blare and the villagers realize
they are surrounded by the troops of King Saran.  After calling
for the return of Princess Amari and the scroll, the army attacks
and the King's soldiers slaughter the villagers.  Zélie is taken
prisoner, while Tzain and Amari escape with the sacred relics.

Zélie hangs by chains in a prison cell.  Inan enters with two
lieutenants of King Saran's army, but quickly dismisses them from
the cell and begs Zélie to save herself by cooperating.  King
Saran arrives and begins torturing her over the objections of Inan.
That night, the Prince frees a barely breathing Zélie from her
cell.  Tzain and Amari stage a simultaneous attack on the prison,
and Zélie is able to escape.  Inan stays with King Saran and his
men, assuring Zélie that he will protect her from inside the

regime.

Zélie, Amari, and Tzain embark on the final leg of their journey to the Holy Temple. They enlist the help of friendly mercenaries and sail to the island on which the temple is located. The island is already swarming with Saran's soldiers when they arrive, but after donning disguises and creating distractions, the three are able to enter the Holy Temple. As Zélie begins to perform the sacred ritual, Saran and Inan emerge from the shadows with Zélie's father Baba as prisoner.

Zélie, realizing that she has been betrayed by Inan, agrees to trade the relics for Baba's life. She hands over the scroll and the sunstone, but the King kills her father. A climactic battle ensues. Zélie, enraged, taps into her magical abilities and calls upon her father and mother's spirits to attack the King's men, while Inan uses Zélie's own magic to destroy the scroll. As King Saran rejoices, Inan sees a mercenary approaching him from behind and thwarts the attack with his magical powers, saving his father's life. King Saran, however, is unable to accept that his son is a maji, and thrusts his sword into Inan's torso. Princess Amari, who still loves her brother despite his betrayal, avenges his death by defeating Saran in a sword fight.

Calling upon the collective memory of her ancestors, Zélie completes the ritual without the sacred scroll. She enters some form of the afterlife and interacts with the spirits of her mother

and father, who tell her that her work in Orïsha is not done yet. The novel ends with Zélie regaining consciousness in the Holy Temple and discovering that not only was the ritual successful, but that, mysteriously, Amari has acquired magical powers as a result.

ii. <u>Banished: A Novel</u>

<u>Banished</u> is the story of Monica's decades-long pursuit of power in the Kingdom of Nuua, and how the King, Princess, and others come together to stop her. The story is told in the third-person and is a brief 143 pages in length.

The novel begins <u>in medias res</u>, with Princess Antherosangojunella (the "Princess") waiting at an airport for the arrival of her lover Miguel. The reader is abruptly transported back to the birth of the Princess, which is the chronological starting point of the story. Shortly thereafter, Monica poisons the Princess's mother, the queen, resulting in her death. A grieving King Kukoca of Nuua (the "King") is urged by his people to re-marry. They hold an open competition to select the new queen, which Monica enters and wins. The King accepts her as his wife, despite his feelings for the late queen's handmaiden (and current caregiver to the Princess), Bianca.

Monica, an irredeemably evil woman, is constantly at odds with the King over his various acts of benevolence and Bianca's enduring presence at the palace. Threatened by the King's

affection for Bianca, Monica seeks help from the "witches of the mountain," who agree to give her a potion that will make him love Monica instead of Bianca.  Much to Monica's chagrin, the potion only strengthens the King's affection for Bianca.  The King decides to end his marriage to Monica, and gives her one month to get her affairs in order.  In an attempt to salvage the marriage and maintain her grip on power, Monica gets pregnant with another man and convinces the King that it is his child.  The ploy works, as the King agrees to stay with her for the good of the child (a boy named Daniel).

The King discovers that Monica has an abandoned daughter, Alisa, and invites her to come live with them at the palace.  Alisa befriends the Farmer's daughter, Anna, and falls in love with the Farmer's son Miguel, both of whom also live at the palace.  Alisa makes Anna promise to set her up on a date with Miguel in exchange for helping Anna cheat on her tests in school.  Anna agrees but is unable to deliver because Miguel loves the Princess.

The witches of the mountain inform Monica that they see potential in Anna and want to begin training her to become a witch. Unbeknownst to Anna, Monica begins training her in witchcraft. Time abruptly passes, and the reader learns that Anna, Alisa, Miguel, and the Princess are now in high school together.  Miguel dances with the Princess at his graduation, enraging Alisa.  Anna and Alisa head to college together, where Alisa continues to

threaten Anna about setting her up on a date with Miguel. Anna, who realizes that she has developed the power to make people disappear, tricks Miguel and the Princess into meeting her at the school and banishes them to an unknown land in a misguided attempt to resolve her situation with Alisa.

The story picks back up where the novel began, with the Princess waiting for Miguel at an airport in the unknown land. The reader is told that Miguel has become a renowned singer and has forgotten his past life, while the Princess has gone to medical school and become a doctor. The Princess waits at the airport every day for Miguel to arrive so that she can convince him that they were in love in a past life. Eventually, Miguel arrives at the airport and the Princess kidnaps him and his musical band. After holding them in captivity for months, she is finally able to convince Miguel that they are in love and knew each other in another world.

Meanwhile, back in Nuua, Monica has deposed the King and thrown him in prison, along with Anna. Anna communicates telepathically with the spirit of an airport guard from the unknown land who is able to facilitate the return of Miguel and the Princess to Nuua. The Princess confronts Monica and is thrown in prison with her father. The King convinces a guard to free them and the group goes to the palace just in time to stop Monica's impending coronation. The King announces his intention to marry

Bianca. The Princess and Miguel contemplate their own marriage. Monica is arrested, prosecuted, and sentenced to life in prison for her misdeeds.

C. **Procedural History**

The complaint in this action was filed on September 26, 2018. ECF No. 1. Counsel for defendants Macmillan and Adeyemi filed a letter seeking leave to file a motion to dismiss on November 9, 2018, Ltr., ECF No. 19, to which plaintiff responded on November 13, Ltr., ECF No. 20. After reviewing the pleading and the parties' respective letters, the Court held a teleconference with the parties and expressed skepticism as to the viability of plaintiff's claims as stated. Plaintiff subsequently filed the operative amended complaint on January 10, 2019. On January 16, 2019, Adeyemi and Macmillan filed the motion presently before the court seeking dismissal of the amended pleading in its entirety, as well as reasonable attorneys' fees and costs pursuant to 17 U.S.C. § 505.

## II. **DISCUSSION**

A. **Standard of Review**

In order to withstand a Rule 12(b)(6) motion, the complaint must "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." _Ashcroft v._
_Iqbal_, 556 U.S. 662, 678 (2009) (citing _Twombly_, 550 U.S. at 556).
More specifically, the plaintiff must allege sufficient facts to
show "more than a sheer possibility that a defendant has acted
unlawfully." _Id._ If the plaintiff has not "nudged [his or her]
claims across the line from conceivable to plausible, [the]
complaint must be dismissed." _Twombly_, 550 U.S. at 570.

### B. **Copyright Infringement**

"Copyright infringement occurs where a plaintiff owns a valid
copyright and another person copies its constituent elements."
_Effie Film, LLC v. Murphy_, 564 F. App'x 631, 632 (2d Cir. 2014)
(summary order) (internal quotation marks omitted). "In the
absence of direct evidence, copying is proven by showing (a) that
the defendant had access to the copyrighted work and (b) the
substantial similarity of protectable material in the two works."
_Williams v. Crichton_, 84 F.3d 581, 587 (2d Cir. 1996) (internal
quotation marks omitted).

Defendants do not dispute that Adeyemi had access to the
copyrighted material for purposes of the pending motion.[3] "This
case thus turns upon the second part of the test: whether, in the

---

[3]      Defendants, for other purposes, "vigorously deny they had any access to
_Banished_, or even knew of its existence." Mem. of Law in Supp. of Mot. to
Dismiss Am. Compl. ("Br.") 8 n.3, ECF No. 26. Indeed, there is little in the
amended pleading to suggest otherwise, notwithstanding plaintiff's dubious
allegation that her self-published work "has gained widespread recognition."
AC ¶ 9.

eyes of the average lay observer, [Children is] substantially similar to the protectable expression in [Banished]." Williams, 84 F.3d at 587. "If the similarity concerns only noncopyrightable elements of a plaintiff['s] work," or the works are not substantially similar as a matter of law, dismissal is appropriate.[4] Id. (internal quotation marks omitted).

In determining whether similarities between the two works relate to protectable elements of Banished, we are mindful of "the axiom of copyright law that the protection granted to a copyrightable work extends only to the particular expression of an idea and never to the idea itself." Reyher v. Children's Television Workshop, 533 F.2d 87, 90 (2d Cir. 1976); see also 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea [,] . . . concept, [or] principle, . . . regardless of the form in which it is described, explained, illustrated, or embodied in such work."). We are also mindful of the so-called scènes à faire doctrine, which renders "unprotectable elements that follow naturally from a work's theme rather than from an author's creativity." Silberstein v. John Does 1-10, 242 F. App'x 720, 722 (2d Cir.

---

[4]     We reject plaintiff's assertion that the question of substantial similarity is not properly resolved at the motion to dismiss stage. The Second Circuit has made it plain that where, as here, the works are incorporated into the complaint by reference, "it is entirely appropriate for [a court] to consider the similarity between those works in connection with a motion to dismiss, because the court has before it all that is necessary in order to make such an evaluation." Peter F. Gaito Architecture, LLC, 602 F.3d at 64 (citing cases).

2007). For example, "[f]oot chases and the morale problems of policemen, not to mention the familiar figure of the Irish cop, are venerable and often-recurring themes of police fiction," and are not, without more, entitled to copyright protection. Walker, 784 F.2d at 50.

Although liability results only if the protectable elements of the works at issue are substantially similar, the Court's analysis "is not simply a matter of ascertaining similarity between components viewed in isolation." Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc., 338 F.3d 127, 134 (2d Cir. 2003). "Such a scattershot approach cannot support a finding of substantial similarity because it fails to address the underlying issue: whether a lay observer would consider the works as a whole substantially similar to one another." Williams, 84 F.3d at 590. Accordingly, in evaluating literary works, the Court assesses similarities in such aspects as plot, characters, setting, and themes, and takes special care to compare "the contested [work's] total concept and overall feel with that of the allegedly infringed work, as instructed by our good eyes and common sense." Peter F. Gaito Architecture, 602 F.3d at 66 (internal citation and quotation marks omitted); see also Williams, 84 F.3d at 590.

### C. Comparison of the Two Works

After a careful examination of the aforementioned aspects of Children and Banished, as well each work's total concept and

overall feel, we conclude that, at anything but the most abstract levels of generality, the two works are nothing alike, let alone substantially similar.

i. Plot

Without restating the Court's synopses of the two works, suffice it to say that we do not credit plaintiff's brazen allegation that "almost the entire plot of [Children], including character description and specific lines, used [Banished]." AC ¶ 4. Quite the contrary, in fact: we find that upon a careful review of the two works, their plots share virtually nothing in common. Children is structured as a traditional quest narrative, with its young protagonists undertaking a journey and overcoming various obstacles in order to return magic to Orïsha. The protagonists in Banished do not undertake a journey, and overcome entirely distinct obstacles (e.g., being banished to an unknown land) in order to accomplish entirely distinct goals (e.g., stopping Monica from taking the throne in Nuua). The utter dissimilarity between the plots of the two works is perhaps best exemplified by the respective fates of the royal families. In Banished, "the life and the happiness of a royal family that could have been lost, was saved, and renewed," Banished at 143, while Children ends with Prince Inan and King Saran lying dead on the floor of the Holy Temple after a climactic intra-family battle scene.

No doubt recognizing that the two works tell fundamentally

different stories, plaintiff attempts to support her claim by "emphasiz[ing] random similarities scattered throughout the works." <u>Williams</u>, 84 F.3d at 590. <u>See</u> Am. Compl. Ex. 4 ("Ex. 4"), ECF No. 21-4 (entitled "Samples of pattern similarities of Plot"). Once examined in any detail, however, these isolated examples prove to be exceedingly dissimilar.

The reference to "blood mixing" in both works is illustrative. <u>See</u> Ex. 4 at 5. In <u>Children</u>, a divîner named Kwame cuts his hand open to trigger so-called "blood magic," which allows divîners to perform magic in the absence of a connection to the gods. He employs the ritual in the midst of a battle with King Saran's men, and the "mixing" that Adeyemi refers to is not a physical combination, but rather the dual scents of burning flesh and blood in the air. By contrast, in <u>Banished</u>, Anna cuts her and Alisa's hand and physically mixes their blood to prove to Alisa that she is not lying about setting Alisa up with her brother Miguel. There is no connection to magic, and Anna subsequently describes the act as a joke.

Another example is Amanze's claim that Adeyemi used the ten members in Miguel's musical band in <u>Banished</u> as the basis for the ten maji clans in <u>Children</u>. <u>See</u> Ex. 4 at 7. Putting aside the fact that the purported similarity is predicated on a flagrant counting error - there are only nine members of Miguel's band, not

ten[5] – the mere use of a number is not protectable, and the Court cannot conceive of any other overlap between the two sets of characters.

Other alleged similarities, such as characters falling in love, betrayal, persecution, royalty, missions, imprisonment, fleeing antagonists, magical powers, escape scenes, and spectral visions, are likewise unprotectable ideas expressed in strikingly dissimilar ways, and constitute nothing more than paradigmatic scènes à faire of fairytales and fantasies, among other genres. See, e.g., Abdullah v. Walt Disney Co., No. 15 Civ. 9581 (SVW)(JPR), 2016 WL 5380930, at *5 (C.D. Cal. Mar. 14, 2016) (dismissing action where alleged similarities involved scènes à faire "such as princes, princesses, castles, magical powers, love, betrayal, and a protagonist who seeks to conceal a characteristic from the public"), aff'd, 714 F. App'x 758 (9th Cir. 2018);

---

[5]     Amanze includes Nabicius, an airport guard, in her count of Miguel's band members.  See Banished at 125.  This is by no means the only example of plaintiff mischaracterizing the works at issue to manufacture similarity.  Nor are such mischaracterizations limited to allegations contained in the exhibit attached to plaintiff's amended complaint.  In her opposition brief, for example, plaintiff falsely asserts that characters in both works were "whisked away magically to other locations as part of their quest.  In Banished to Neworld [sic] and in Blood and Bone it is the Maji temple."  Mem. of Law in Opp. to the Mot. to Dismiss ("Opp. Br.") 8, ECF No. 31.  Neither the Princess nor Miguel are banished to the unknown land as part of a quest, and Zélie sails to the Holy Temple on a boat.  Similarly, the protagonists in each novel are not "persecuted and [] on the run from the antagonist: in Banished the antagonist is the Queen Monica; and in Blood and Bone it is the King Saran [sic]."  Id. The Princess and Miguel are banished from Nuua by Anna for reasons entirely unrelated to Monica, and Anna herself directly confronts, not evades, Monica. The argument that these constitute plot similarities (let alone similarities relating to protectable elements of Banished) reflects, at best, an inexcusable ignorance of the substance of the works and, at worst, bad faith on the part of plaintiff and her counsel.

<u>Crawford v. Midway Games Inc.</u>, No. 07 Civ. 00967 (FMC) (JCX), 2008
WL 11334537, at *7 (C.D. Cal. Dec. 3, 2008) (finding that the mere
use of "paranormal abilities", including telepathy, telekinesis,
clairvoyance, and the ability to manipulate fire, "cannot be
protected"); <u>DiTocco</u>, 815 F. Supp. 2d at 670 ("Other similarities
— such as the use of magic weapons — are <u>scènes à faire</u> in fantasy
adventure stories.").

Finally, Amanze's use of generic literary devices (<u>e.g.</u>, "she
was as strong as a lioness," Ex. 4 at 6) and ordinary phrases ("the
floor in her jail cell," <u>id.</u> at 1) do not constitute protected
expressions and cannot support a claim of substantial similarity.
<u>Lewinson v. Henry Holt & Co., LLC</u>, 659 F. Supp. 2d 547, 571
(S.D.N.Y. 2009) (citing support for the proposition that
expression through metaphor is protectable only if it is
sufficiently original); <u>Arica Inst., Inc. v. Palmer</u>, 970 F.2d 1067,
1072 (2d Cir. 1992) ("[T]he 'ordinary' phrase may be quoted without
fear of infringement . . . .").

In short, plaintiff adduces no actionable similarities
between the plots of the two works, and the Court perceives none.

ii. <u>Characters</u>

The Court further concludes that the characters of the two
works are not substantially similar. In so concluding, we
summarily reject Amanze's blanket assertion that nearly every
character in <u>Banished</u> was "changed to" a character in <u>Children</u>.

<u>See</u> Am. Compl. Ex. 3, ECF No. 21-3 (confusingly titled "Banished (B), Hollywood Treatment (Screenplay for Banished)"). Many of the alleged parallels are absurd on their face. <u>See</u> <u>id.</u> (comparing, <u>e.g.</u>, the supreme deity of Orïsha to a doctor who befriends the Princess; Monica to a teenager who appears in precisely two scenes in <u>Children</u>; Alisa to a small child named Bisi because Monica once refers to Alisa as "little girl"; the benevolent ruler King Kukoca to the murderous antagonist King Saran; Prince Inan to young Prince Daniel, who is barely mentioned in <u>Banished</u> and has no dialogue). And even her less frivolous comparisons fall well short of clearing the high bar for demonstrating substantial similarity in characters. <u>See</u> <u>Sheldon Abend Revocable Tr. v. Spielberg</u>, 748 F. Supp. 2d 200, 208 (S.D.N.Y. 2010). For example, plaintiff claims that Anna and Miguel were "changed to" Zélie and Tzain because both are siblings, children of "tradesmen," and friends of princesses.[6] These are obviously unprotectable aspects of characters who share little else in common.[7]

---

[6]    Plaintiff further claims that the mothers of both pairs of characters "die for the sake of or by magic." Opp. Br. 8. This is demonstrably false, as Anna and Miguel's mother Sarah does not die in <u>Banished</u>, "by magic" or otherwise.

[7]    That Amanze relies solely on generic, unprotectable traits for purposes of alleging similarity comes as no surprise given her wholly two-dimensional treatment of the characters in <u>Banished</u>. By way of example, the Court struggles to ascribe even a single attribute to either the Princess or Miguel (two of the more prominent characters in <u>Banished</u>) apart from their affection for one another. Courts have long recognized that such characters, who possess few (if any) distinguishing features or traits, are entitled to lesser protection under

The Court further rejects plaintiff's allegation that each of the ten maji clans are amalgamations of various individual characters from Banished.  See Am. Compl. Ex. 2, ECF No. 21-2. The alleged similarities are based on either unprotectable elements of the characters or strained readings of out-of-context passages that fail to withstand scrutiny.  See, e.g., id. at 2 (claiming that the "man in the cave" in Banished was substantially similar to a "Burner" because he "walked close to the fire, looked into it and started to shake his head."); id. at 4 (claiming a character in Banished was a "Lighter" because he tells the Princess: "You have brought me out from the darkness").

     iii. Settings

The Court also finds no protectable similarities between the settings of the two works.  Children is set in Orïsha, a mythical pre-industrial kingdom that roughly approximates the geography of modern-day Nigeria.  Because the characters rarely linger in any one place for too long, the reader experiences a diversity of the kingdom's villages, towns, and cities, each with their own

---

the copyright laws, as "[n]o character infringement claim can succeed unless plaintiff's original conception sufficiently developed the character, and defendants have copied this development and not merely the broader outlines." Smith v. Weinstein, 578 F. Supp. 1297, 1303 (S.D.N.Y. 1984), aff'd mem., 738 F.2d 419 (2d Cir. 1984); see also Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2d Cir. 1930) (Hand, J.) ("The less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly."); see also Nobile v. Watts, 289 F. Supp. 3d 527, 536 (S.D.N.Y. 2017), aff'd, 747 F. App'x 879 (2d Cir. 2018).

distinctive culture and feel.  By contrast, <u>Banished</u> takes place in a post-industrial era,[8] and is mostly confined geographically to the royal palace in Nuua or the unknown land to which Miguel and the Princess are banished.  To the extent that either are described with enough to detail to warrant copyright protection, they are not substantially similar to Adeyemi's Orïsha.

       iv.  <u>Themes</u>

Aside from both authors' incorporation of Nigerian cultural themes in their works, which are not copyrightable, <u>see</u> <u>Alexander v. Haley</u>, 460 F. Supp. 40, 45 (S.D.N.Y. 1978), plaintiff does not specifically identify overlapping themes between <u>Banished</u> and <u>Children</u>.  The Court acknowledges that, distilled to the highest levels of abstraction, the two works may share certain thematic elements such as the power of love or the triumph of good over evil.  But the expression of those shared elements are dramatically different in the two works.  Moreover, <u>Children</u>'s primary themes - the perils of racism and violence, self-discovery and self-acceptance, and empowering the oppressed – are absent from <u>Banished</u>, which is narrowly focused on the rise and fall of Monica and the fairytale love story of the Princess and Miguel.

       v.  <u>Total Concept and Overall Feel</u>

---

[8]    While the precise time setting of <u>Banished</u> is unclear, it contains references to, <u>inter alia</u>, automobiles, airplanes, colleges, medical schools, hospitals, psychologists, media reporters, local television stations, radios, and album sales.  These trappings of a more familiar, contemporary society are noticeably absent from <u>Children</u>.

Finally, the total concept and overall feel of the two works are markedly distinct. For one, as described above, the works are substantially dissimilar in terms of plot, characters, setting, and themes. While differences alone may not excuse actual infringement, "the Second Circuit has observed that 'numerous differences tend to undercut substantial similarity.'" Adsani v. Miller, No. 94 Civ. 9131, 1996 WL 194326, at *3 (S.D.N.Y. Apr. 22, 1996) (quoting Warner Bros. Inc. v. Am. Broad. Companies, Inc., 720 F.2d 231, 241 (2d Cir. 1983)).

Further distinguishing the concept and feel of the works is Adeyemi's attention to detail and world-building. She describes crowded markets in the capital of Lagos, hidden temples in the jungle, desert cities, and villages of the Gombe River Valley. The reader learns of the rich history of Orïsha and the ancient maji clans, which serves as necessary background for the quest at the heart of the story. Banished, on the other hand, offers little in the way of backstory and the reader learns next to nothing of the world outside of the royal palace in Nuua.

Moreover, Children is, at its core, character driven. Adeyemi uses the first-person perspective to go inside the minds of her characters and portray them with some level of depth and nuance. The reader, for example, learns that Zélie is driven in part by the trauma of watching her mother die in the Raid; she is strong-willed, and a fierce protector of her family and her

culture. Inan struggles with his identity as a divîner, and Amari is determined to prove that she is more than just a privileged princess. Banished, on the other hand, is written in the third-person and, as discussed supra, barely scratches the surface of even its most prominent characters.

Differences in the pacing and mood of the two works further contribute to their distinctive overall feels. Adeyemi often spends several chapters describing the events of a single day, while time passes in Banished in increments of weeks, months, and even years. Moreover, antagonists are hot on the heels of Zélie, Amari, and Tzain throughout Children, creating a constant sense of tension and, at times, dread. By contrast, Banished matter-of-factly ushers readers from one plot point to the next, with little in the way of sustained build-up.

In sum, Banished and Children are vastly different works that share next to nothing in terms of plot, characters, setting, themes, total concept, or overall feel. The Court has little trouble concluding that the two works are not substantially similar as a matter of law. Accordingly, plaintiff has failed to plausibly allege the misappropriation of protectable expression and defendants' motion to dismiss is granted in its entirety.

### D. **Attorneys Fees and Costs**

Defendants further ask the Court to exercise its discretion under 17 U.S.C. § 505 and award defendants reasonable attorneys'

fees and costs as the prevailing party. In exercising this discretion, the Court is guided by the following nonexclusive list of factors: "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." Zalewski v. Cicero Builder Dev., Inc., 754 F.3d 95, 108 (2d Cir. 2014) (quoting Fogerty v. Fantasy, Inc., 510 U.S. 517, 534 & n.19 (1994)). In particular, "objective reasonableness is a factor that should be given substantial weight in determining whether an award of attorneys' fees is warranted" because "the imposition of a fee award against a copyright holder with an objectively reasonable litigation position will generally not promote the purposes of the Copyright Act." Matthew Bender & Co. v. West Publ'g Co., 240 F.3d 116, 121-22 (2d Cir. 2001).

Nearly every argument advanced by plaintiff in this case was either frivolous or based upon mischaracterizations of one or both works. In fact, plaintiff's legal and factual positions were so far afield of objective reasonableness that the Court has serious questions as to whether plaintiff's counsel actually read the works at issue. Perhaps this explains why most of plaintiff's 11-page opposition brief is dedicated to the recitation of undisputed legal principles, rather than the application of those principles to the facts of this case. Accordingly, an award of reasonable attorneys' fees and costs is necessary to compensate defendants

for the resources expended in defending this action and to deter plaintiff and others from pursuing similarly frivolous and objectively unreasonable claims against alleged infringers going forward.

### III. <u>CONCLUSION</u>

For the foregoing reasons, defendants' motion to dismiss is granted in its entirety and with prejudice.  We also dismiss the amended complaint as to non-moving defendant Shoneyin and John Doe defendants "because the issues concerning [Shoneyin and the John Does] are substantially the same as those concerning the other defendants, and [plaintiff] had notice and a full opportunity to make out [her] claim[.]"  <u>Hecht v. Commerce Clearing House</u>, 897 F.2d 21, 26 n.6 (2d Cir. 1990).

The Court further grants moving defendants' request for fees and costs pursuant to 17 U.S.C. § 505.  Adeyemi and Macmillan are hereby directed to submit within fourteen days their application for fees and costs, supported by contemporaneous records organized in a manner that facilitates evaluation by the Court.

The Clerk of Court is respectfully directed to enter judgment for defendants and terminate the motion pending at docket number 25.

Dated:    New York, New York
          July 2, 2019

                          NAOMI REICE BUCHWALD
                          UNITED STATES DISTRICT JUDGE

27